IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD BADWAY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | NO. 07-1333 |

<u>MEMORANDUM</u>

**Padova, J.**                                                                                                        **August 19, 2009**

Plaintiff, executor of the estate of Richard Badway, Jr. ("Ricky"), has brought this action against the City of Philadelphia pursuant to 42 U.S.C. § 1983. Plaintiff contends that the City violated Ricky's Fourteenth Amendment substantive due process rights to life and liberty by failing to timely dispatch an Advanced Life Support ambulance after Ricky's girlfriend called 911 on his behalf.[1] Before the Court is Plaintiff's Motion for Summary Judgment. For the reasons that follow, the Motion is denied.

**I.    FACTUAL BACKGROUND**

On October 22, 2005, shortly before 1:00 a.m., Ricky told his girlfriend, Erin Whittaker, that his heart felt "funny." (Whittaker Dep. at 30.) She suggested that he lie down on the bed. (<u>Id.</u> at 31.) Ricky briefly lay down. (<u>Id.</u> at 32.) A few minutes later, Ricky attempted to get up, told Whittaker that he felt dizzy, and collapsed. (<u>Id.</u> at 33.) Whittaker helped him back onto the bed and called 911. (<u>Id.</u> at 34-35.) While Whittaker was calling 911, Ricky made "weird" breathing noises, his body shook, and his eyes "rolled back in his head." (<u>Id.</u> at 35-36.)

---

[1]The Complaint alleges a negligence claim against the City of Philadelphia pursuant to Pennsylvania's wrongful death and survival statutes, 42 Pa. Cons. Stats. Ann. §§ 8301 and 8302, in addition to the § 1983 claim. The Motion for Summary Judgment does not mention the negligence claim. Consequently, we treat Plaintiff's Motion for Summary Judgment as a motion for partial summary judgment as to only the § 1983 claim.

The City's 911 system received Whittaker's call at 1:00:21 a.m. (Pl. Ex. M.) After 10-15 seconds, Whittaker was connected to Shakeema James, a 911 dispatcher. (Whittaker Dep. at 37; Pl. Ex. P at 1.) Whittaker told James that her boyfriend had collapsed, and James assured Whittaker that "help was on the way, that they were sending an ambulance right now." (Whittaker Dep. at 38.) James asked about Ricky's condition, and Whittaker told her that Ricky's lips were turning blue. (Id.) After Whittaker was unable to locate Ricky's pulse, James told her to perform CPR on Ricky and gave her CPR instructions over the phone. (Id. at 40.) Whittaker asked James a few times during their phone call whether an ambulance was coming and James told her that "help was on the way." (Id. at 41-42.)

The first responders on the scene were firefighters, who were also emergency medical technicians ("EMTs"). (Id. at 45; Davis Dep. at 39; Gough Dep. at 25.) The firefighters were accompanied by a police officer and arrived at Whittaker's apartment at 1:09:26 a.m. (Whittaker Dep. at 45; Pl. Ex. M.) Jason Davis, one of the firefighter EMTs, was the first responder to see Ricky. (Davis Dep. at 39.) Ricky's upper abdominal area, face, neck and upper extremities were blue. (Id.) Ricky did not have a pulse. (Id. at 40.) Davis and Timothy Gough (the other firefighter EMT on the scene), hooked Ricky up to an Automated External Defibrillator (AED), inserted an oral pharyngeal to keep his airway open, "bagged" him, and performed CPR until a paramedic unit arrived at 1:21:53 a.m. (Id. at 40-41; Pl. Ex. M.) The paramedics intubated Ricky, put him on a heart monitor, started an IV and administered the first round of "epi." (Murphy Dep. at 44.) The paramedics transported Ricky to Roxborough Memorial Hospital (1.1 miles from Whittaker's apartment) at 1:34 a.m and arrived at the hospital at 1:36 a.m. (Pl. Ex. R at 1, 3.) Ricky was pronounced dead at 2:10 a.m. (Pl. Ex. S.) The cause of death was cardiac dysrhythmia. (Id.)

Plaintiff contends that the City's policies regarding its 911 service and the manner in which emergency medical services ("EMS") are dispatched placed Ricky "in a position of danger that he would not otherwise have faced, and caused an increase in the likelihood of his death." (Pl. Mem. at 2.) According to Plaintiff, the City's policies contributed to Ricky's death because the City encourages residents to call 911 for emergency services despite being aware that its procedures regarding dispatching emergency services in response to 911 calls are inefficient and could result in considerable delay in the arrival of appropriate emergency services. Consequently, we examine the City's EMS system in detail to determine whether the City's policies created a danger to Ricky, increasing the likelihood of his death.

The City delivers EMS through a tiered system which consists of:

1. Basic Life Support ("BLS") units, ambulances that are staffed with two EMTs. (Pl. Ex. C at 1.) The EMTs can read vital signs, administer oxygen and perform CPR. (Id.) They cannot perform invasive procedures or administer drugs. (Id.)

2. First Responder Units ("FRUs"), fire engines that are staffed with two firefighters who are trained as EMTs. (Id. at 1-2.) The FRUs cannot transport patients to the hospital. (Id. at 2.)

3. Advanced Life Support ("ALS") units, ambulances that are staffed with two paramedics who are certified to "handle advanced pre-hospital emergency medical care of serious illness or injury." (Id. at 1.) Paramedics on ALS units can read electrocardiograms, perform invasive procedures, "such as intravenous cannulation or endotrachael intubation[,]" and can administer medication. (Id.)

The City has 45 ambulances, 28 of which are staffed 24 hours a day, seven days a week. (Id.

at 2.)  The remaining 17 ambulances are used for peak hours only.[2]  (Id.)  Thirty-six of the City's ambulances are ALS units, nine are BLS units.  (Id. at 2 n.2.)  Ambulances are assigned to a home firehouse, but can be designated to respond in an area outside of their home boundaries if they are closest to the scene of the next service call.  (Id. at 2.)  FRUs are able to arrive at the scene of an emergency more quickly than ALS and BLS units because there are 90 engine and ladder companies distributed throughout the City.  (Id.)

The City encourages its residents to call 911 for medical emergencies.  (Pl. Req. for Admis. No. 12.A.;[3] Pl. Ex. C at 3; Moore Dep. at 180.)  Once a caller reaches a 911 dispatcher, the dispatcher first determines whether the caller requires fire or EMS services.  (Pl. Ex. C at 3.)  If the caller requires EMS services, the dispatcher prioritizes the call into one of three categories: (1) Priority 1 (Code Blue), if the person in need of emergency services is not breathing; (2) Priority 2 (ALS/Trauma), if the person in need of emergency services is having difficulty breathing, is in cardiac arrest, is having a stroke, is the victim of a shooting or stabbing, or has fallen more than ten feet and needs ALS or trauma services; and (3) Priority 3 (BLS), if the person requesting emergency services has minor injuries, flu-like symptoms, or is not feeling well.  (Id.; Pl. Req. for Admis. No. 12.D.)

Once the 911 dispatcher has classified the emergency call, he or she logs it into a Computer Assisted Dispatch ("CAD") system for dispatch.  (Pl. Ex. C at 3.)  Calls are dispatched in the order they are entered into the CAD system and not according to their priority.  (Id.)  The CAD system

---

[2] According to the City's Controller, the peak hour ambulances are "staffed at varying hours and days of the week." (Id. at 2.)

[3] Defendant never filed responses to Plaintiff's Requests for Admission.  The matters addressed by those Requests are, accordingly, admitted.  Fed. R. Civ. P. 36(a)(3).

recommends which ambulance to dispatch based on the closest available fire station to the location of the emergency. (Id.) However, since the BLS and ALS units are not limited to calls in their home area, and frequently handle runs away from their home area, the CAD system's recommendations are generally useless. (Id. at 19.) Instead, dispatchers rely on radio traffic to identify the location of ambulances and determine which ambulance to dispatch. (Id.)

The City uses a benchmark response time of 8 minutes and 59 seconds (8:59) for the time between when the 911 call comes in and the time a properly equipped and staffed ambulance should arrive at the scene of the emergency. (Id. at 34.) In 2005, the average time for a FRU or ambulance unit to arrive at the scene of an emergency from the time it was dispatched was 6:53 minutes. (Id. at 4.) However, according to the City's own statistics for 2005, ambulances responded within 8:59 from the time of dispatch only 64.41% of the time. (Id. at 6.) Moreover, the time the call is received is not the same as the time of dispatch. A 2006 study conducted by the City showed that 911 dispatchers took an average of 42 seconds to process calls and that they were able to timely send out the most appropriate ambulance only 26% of the time. (Id. at 7.) The study further showed that, "once dispatched, it took ambulance teams close to two minutes (1 minute 45 seconds) after receiving the call until they started traveling to the scene. . . ." (Id.) The study also recognized that, "in more serious emergencies – such as cardiac arrest or shooting victims – when every second of appropriate pre-hospital care and quick transport to a hospital emergency room is critical to the patient's survival, a 'first responder' response may be inadequate." (Id. at 8.) In 2006, it took an average of 11 minutes from the time a 911 call was received by the City until the EMS unit arrived at the scene of the emergency. (Id. at 37.)

Plaintiff maintains that these failures in the City's EMS policies played a direct role in

5

Ricky's death. When James received Whittaker's 911 call at 1:00:21 a.m., the CAD unit could only recommend a FRU because there were no ambulances available in the first 32 fire stations closest to Whittaker's apartment. (Pl. Ex. M; Pl Ex. P at 1.) James called up a display of all available medic units and dispatched Engine 12 ("E12"), a FRU, and Medic 13 ("M13"), an ambulance, at 1:02:55 a.m. (Pl. Ex. M; Pl. Ex. P at 1.). At 1:04:00 a.m., M13 radioed: "we're coming from presby [sic] we ain't going to get there no time soon." (Pl. Ex. M; Pl. Ex. P at 1.) At 1:05:16 a.m., E12 confirmed that it was responding to Whittaker's address, and James informed E12 that the emergency was a "code blue." (Pl. Ex. M.) At 1:05:55 a.m., ambulance M24, which had previously been off radio and unavailable at Einstein Medical Center, called into the radio and announced that it was available. (Pl. Ex. M; Pl. Ex. P at 1.) At 1:06:24 a.m., James decided to dispatch M24 and recalled M13. (Pl. Ex. M; Pl. Ex. P at 1.) At 1:08:08 a.m., ambulance M22, which had also been off radio and unavailable at Einstein Medical Center, reported by radio that it was available and asked James if she wanted it to respond. (Pl. Ex. M; Pl. Ex. P at 1.) At 1:08:14 a.m., James checked by radio with M24 and learned that M24 had just begun to leave Einstein, nearly two full minutes after it had been dispatched. (Pl. Ex. M; Pl. Ex. P at 1-2.) James then dispatched M22 to Whittaker's apartment at 1:08:17 a.m., and dispatched M24 to another emergency call. (Pl. Ex. M; Pl. Ex. P at 2.) E12 arrived at Whittaker's apartment at 1:09:26 a.m., six minutes and 31 seconds after it had been dispatched, and nine minutes and five seconds after James took Whittaker's 911 call. (Pl. Ex. M; Pl. Ex. P at 2.) M22 arrived at Whittaker's apartment at 1:21:53 a.m., 13 minutes and 36 seconds after being dispatched, but 21 minutes and 32 seconds after Whittaker's 911 call was received. (Pl. Ex. M.)

To establish that the City's delay in providing appropriate emergency services to Ricky

contributed to his death, Plaintiff relies on the expert report of cardiologist Sheldon L. Brownstein, M.D., F.A.C.C., who opined that "the tardiness in response to the decedent contributed to his death by falling outside the standard of care in a metropolitan or urban setting." (Brownstein Rpt. at 2.) According to Dr. Brownstein, if Ricky had received advanced life support (which Dr. Brownstein defined as an airway, breathing and CPR), within five to six minutes of the onset of his cardiac dysrhythmia, he would have had a 30-50% chance of survival. (Id.) E12 did not reach Ricky and begin providing an airway, breathing and CPR until nine minutes and five seconds had elapsed after Whittaker called 911. (Pl. Ex. M; Davis Dep. at 40-41.)

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must -- by affidavits or

7

otherwise as provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000) (citations omitted). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. See Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993).

### III. DISCUSSION

    A.    Legal Standard for Municipal Liability Under Section 1983

Plaintiff has asserted his federal claim against the City pursuant to Section 1983, which provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000) (citing Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985) (stating that Section 1983 "creates no substantive

rights; it merely provides remedies for deprivations of rights established elsewhere" (citing Baker, 443 U.S. at 140, 144, n.3)). Consequently, "[t]o establish valid claims under § 1983, the plaintiff must demonstrate that the defendants, while acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States." Shuman ex rel. Shertzer v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005) (citing Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir.1995)). In this case, Plaintiff asserts that the City violated Ricky's substantive due process rights to life and liberty secured by the Fourteenth Amendment.

A municipality can only be liable under Section 1983 when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A municipal policy is defined as "'a statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers.'" Simmons v. City of Philadelphia, 947 F.2d 1042, 1059 (3d Cir. 1991) (quoting Monell, 436 U.S. at 690). A municipal custom consists of "'such practices of state officials . . . [as are] so permanent and well settled as to constitute a custom or usage with the force of law.'" Id. (quoting Monell, 436 U.S. at 691).

Once a policy or custom is identified, a plaintiff must establish that the municipality maintained the policy or custom with "deliberate indifference" to the constitutional deprivations that the policy or custom caused. City of Canton v. Harris, 489 U.S. 378, 389 (1989); see also Beck v. City of Pittsburgh, 89 F.3d 966, 972 (3d Cir. 1996) (stating that the "deliberate indifference" standard, though originally created in the context of a failure to train claim, has been applied to other claims of municipal liability based on policy or custom). Deliberate indifference may be established by evidence that policymakers were aware of the constitutional deprivations and of the alternatives

9

for preventing them, "but either deliberately choose not to pursue these alternatives or acquiesced in a long-standing policy or custom of inaction in this regard." Simmons, 947 F.2d at 1064 (footnote omitted); see also Bd. of County Comm'rs v. Brown, 520 U.S. 397, 407 (1997) ("If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action -- the 'deliberate indifference' -- necessary to trigger municipal liability." (citing City of Canton, 489 U.S. at 390 n.10)). In addition, a plaintiff must also prove that the municipal policy or custom was "the proximate cause of the injuries suffered." Beck, 89 F.3d at 972 n.6. The United States Court of Appeals for the Third Circuit has explained that "[a] sufficiently close causal link between . . . a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir.1990) (quotation omitted).

      B.      Plaintiff's Three Theories of Liability

Plaintiff advances three theories of liability under 42 U.S.C. § 1983. First, Plaintiff alleges that the City maintained a policy of deliberately and knowingly effectuating a faulty EMS system that was unable to provide necessary medical assistance while simultaneously precluding any alternative. Second, Plaintiff contends that there was a "special relationship" between Ricky and the City such that the City had a duty to protect Ricky's health and safety. Third, Plaintiff maintains that Ricky died as the result of a state-created danger.

       1.       Constitutional violation

Plaintiff contends that the City's 911 policy violated Ricky's substantive due process right to life and liberty pursuant to the Fourteenth Amendment and has submitted evidence that the City's 911 system is flawed. The City requires its 911 dispatchers to waste valuable response time prioritizing calls, even though it does not use these priorities in dispatching emergency services. (Pl. Ex. C at 3; Pl. Req. for Admis. Nos. 12.D., 12.E.) The City then requires 911 dispatchers to utilize a CAD system for assigning units to respond to emergency calls, even though that system is largely useless. (Pl. Ex. C at 3, 19; Pl. Req. for Admis. No. 12.I.) As a result of these inefficiencies, the City's 911 dispatchers rely on radio traffic to identify the location of ambulances and determine which ambulance or FRU to dispatch. (Pl. Ex. C at 19.) Using this system, the City's 911 dispatchers were able to timely dispatch the correct type of response unit for emergency calls only 26% of the time in 2006. (Id. at 7.) Indeed, while the average time for a FRU or ambulance unit to arrive at the scene of an emergency from the time it was dispatched was 6:53 minutes in 2005, ambulances reached the scene of an emergency within 8:59 or less from the time of dispatch only 64.41% of the time in 2005. (Id. at 4, 6.) Consequently, on average, the City's 911 system was not able to get any kind of emergency response unit to the site of a cardiac arrest in time to prevent brain death, not even a FRU. (Brownstein Rpt. at 2.)

We need not determine whether the evidence establishes that the City was deliberately indifferent to the flaws in its 911 system in 2005,[4] or whether the evidence establishes that the flaws in the City's 911 system proximately caused Ricky's death, unless these flaws violated Ricky's

---

[4]The study from which we have drawn much of the data evidencing the flaws in the City's 911 system was prepared by the City Controller's office and completed in December 2007. (Pl. Ex. C.)

substantive due process rights.  See Regalbuto v. City of Philadelphia, 937 F. Supp. 374, 378 (E.D. Pa. 1995) ("[U]nless plaintiff first establishes that he or she has suffered a constitutional injury, it is irrelevant for purposes of § 1983 liability whether the city's policies, enacted with deliberate indifference, caused an injury." (citing Mark, 51 F.3d at 1149-50)).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Clause is, however, "phrased as a limitation on the State's power to act . . . .  It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means."  DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195 (1989).  Consequently, the "Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  Id. at 196 (citations omitted).  The Supreme Court has explained that, since the "Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them."  Id. at 196-97 (footnote omitted).   The Third Circuit has held, based upon this principle, that "there is no federal constitutional right to rescue services, competent or otherwise" and that the Due Process Clause of the Fourteenth Amendment does not "place an affirmative obligation on the State to provide competent rescue services if it  chooses to provide them."  Brown v. Commonwealth of Pa. Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 478 (3d Cir. 2003).

We hold, therefore, that the City's provision of flawed emergency services did not, by itself, violate Ricky's substantive due process rights to life and liberty pursuant to the Fourteenth Amendment. Since Ricky did not suffer a constitutional injury, we conclude that Plaintiff has failed to establish his entitlement to judgment as a matter of law as to his claim that the City maintained a policy of deliberately and knowingly effectuating a faulty EMS system. Plaintiff's Motion for Summary Judgment is, accordingly, denied as to this aspect of his claim for relief pursuant to § 1983.

Nonetheless, our analysis of Plaintiff's municipal liability claim does not end here. There are two exceptions to the general rule that "the Due Process Clause does not impose an affirmative duty upon the state to protect citizens . . . ." Sanford v. Stiles, 456 F.3d 298, 303-04 (3d Cir. 2006) (citing DeShaney, 489 U.S. at 198-200). "First, the state has a duty to protect or care for individuals when a 'special relationship' exists." Id. at 304 (footnote omitted). "Second, the state has a duty when a 'state-created danger' is involved." Id. (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir. 1997)). Plaintiff argues that both of these exceptions apply in the instant matter.

    2.    Special relationship

Plaintiff contends that Ricky had a special relationship with the City, such that the City had an affirmative duty to provide him with timely ALS care. According to Plaintiff, this special relationship arose from the City's policy to encourage residents to call 911 for emergency services. (Pl. Mem. at 23.) Plaintiff maintains that, once a person calls the City's 911 service, he or she is told that help is on the way and to wait for an ambulance, effectively preventing the caller from contacting a private ambulance service. There is evidence on the record that supports Plaintiff's contentions.

The City promotes the use of its 911 system for emergency services. (Moore Dep. at 180.)

Philadelphia's 911 dispatchers tell callers that help is on the way, but do not tell them how soon help will arrive, what kind of emergency response unit will arrive, or whether the first responder will be able to transport the patient to the hospital. (Pl. Req. for Admis. Nos. 12.F., 12.G.; James Dep. at 58; Moore Dep. at 209-10.) Philadelphia's 911 dispatchers also tell callers not to move patients who are Priority 1 or 2. (Pl. Req. for Admis. No. 12.H.) In addition, 911 dispatchers are not permitted to refer 911 calls to private ambulance companies or to inform callers about the availability of private ambulance services. (Pl. Req. for Admis. Nos. 12.O., 12.P.; Moore Dep. at 210.)

The facts before us show that these City policies were followed in the instant case. James told Whittaker "that help was on the way, that they were sending an ambulance right now." (Whittaker Dep. at 38.) Later, while she was performing CPR at James's direction, Whittaker asked whether the ambulance was coming and James told her "'yes, they're on their way.'" (Id. at 42.) Whittaker asked James where the ambulance was a couple of times before E12 arrived and was told each time that "help was on the way." (Id.) Whittaker was never advised to call a private ambulance service. (Id. at 43.)

This evidence is, however, insufficient to establish that Ricky had a special relationship with the City such that the City had an affirmative duty to provide him with timely and adequate emergency care. The Supreme Court explained in DeShaney that this exception applies only when the State exercises physical custody over the individual without his or her consent:

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs - e.g.,

> food, clothing, shelter, medical care, and reasonable safety - it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf - through incarceration, institutionalization, or other similar restraint of personal liberty - which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

DeShaney, 489 U.S. at 199-200 (citations and footnotes omitted). Lack of consent is a crucial factor in the creation of a special relationship. The Third Circuit explained in Torisky v. Schweiker, 446 F.3d 438 (3d Cir. 2006), that "a custodial relationship created merely by an individual's voluntary submission to state custody is not a 'deprivation of liberty' sufficient to trigger" the state's obligation to take responsibility for his or her safety and well-being. Id. at 446. In addition, the state's involuntary physical custody of the individual must be full-time and continuous:

> The state's duty to prisoners and involuntarily committed patients exists because of the full time severe and continuous state restriction of liberty in both environments. Institutionalized persons are wholly dependant upon the state for food, shelter, clothing and safety. It is not within their power to provide for themselves, nor are they given the opportunity to seek outside help to meet their basic needs.

D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1371 (3d Cir. 1992). Consequently, an involuntary custodial relationship is not a special relationship unless the state restricts the freedom of the individual to the extent that he or she is "prevented from meeting [his or] her basic needs." Id. at 1372.

The evidence of record in this case does not establish that Ricky was involuntarily subjected

15

to the physical control of the City such that a special relationship arose between Ricky and the City. Although Ricky did not call 911 himself and, being unconscious, could not consent to Whittaker's call, the City did not affirmatively act to restrain Ricky's freedom to act on his own behalf. See DeShaney, 489 U.S. at 200; see also Regalbuto, 937 F. Supp. at 379-80 (finding that no special relationship existed between Regalbuto and the City of Philadelphia even though Regalbuto "was [allegedly] deprived of his ability to seek alternative sources of aid because the [911] dispatcher repeatedly assured the callers [to the 911 system] that help was on the way"); Huston v. Montgomery County, Civ. A. No. 95-4209, 1995 WL 766308, at *4 (E.D. Pa. Dec. 28, 1995) (noting that the defendant's promotion "of the '911' system as the primary emergency services system for the citizens of Montgomery County" and the "assurances of the '911' dispatcher(s) to Patrick Huston and his fiancee that an ambulance was on its way and that Patrick Huston should lie down and not move" did not create a special relationship between Huston and Montgomery County). Moreover, even if the City had taken involuntary physical custody of Ricky at the time Whittaker placed her call to 911, 21 minutes of physical custody is not sufficiently full-time and continuous to establish a special relationship between Ricky and the City. See Sanders v. City of Philadelphia, 513 F. Supp. 2d 439, 446 (E.D. Pa. 2007) (holding that a special relationship was not created between Sanders and the City when City police officers placed Sanders in the back of their patrol wagon and drove him to the hospital). We conclude that Plaintiff has failed to establish his entitlement to judgment as a matter of law as to his claim that a special relationship existed between Ricky and the City such that the City had an affirmative duty to provide him with timely and adequate emergency care. Plaintiff's Motion for Summary Judgment is, accordingly, denied as to this aspect of his claim for relief pursuant to § 1983.

3.  State-created danger

Plaintiff also contends that the City is liable for Ricky's death because it created or enhanced the danger to Ricky's life. To prevail under the state-created danger theory, Plaintiff must prove the following four elements:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Sanford, 456 F.3d at 304-05 (quoting Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) and citing Estate of Smith v. Marasco, 430 F.3d 140, 153 (3d Cir. 2005)). We focus on the fourth element because Plaintiff's failure to establish this element is sufficient to eliminate his entitlement to summary judgment as to this aspect of his Section 1983 claim.

Plaintiff contends that the City acted affirmatively to expose Ricky to deadly harm through James, the 911 dispatcher, who told Whittaker that help was on the way, even though no ALS unit could arrive in time to prevent Ricky's death. There is evidence on the record before us that James assured Whittaker that help was on the way even though she was aware that Ricky was turning blue and that she had only been able to timely dispatch a FRU. (Whittaker Dep. at 37-40.) This evidence is not, however, sufficient to establish that a state actor affirmatively used her authority in a way that

created danger to Ricky or made him more vulnerable to danger than if she had not acted. Sanford, 456 F.3d at 305.

The Third Circuit has held that "an assurance . . . is not an affirmative act sufficient to trigger constitutional obligations." Ye v. United States, 484 F.3d 634, 635, 640-41 (3d Cir. 2007) (finding that a publicly employed doctor's assurance that his patient was fine and had nothing to worry about was not an affirmative act that satisfied the fourth element of the state-created danger theory, even though the patient was having a heart attack and refrained from obtaining medical help for that condition because of the doctor's assurance). Consequently, James's statements to Whittaker that help was on the way cannot constitute affirmative acts that created a danger to Ricky or that made Ricky more vulnerable to danger. Sanford, 456 F.3d at 305. We find, accordingly, that the evidence of record does not establish that a state actor affirmatively created the danger that Ricky would die of cardiac dysrhythmia or made him more vulnerable to death from that condition. We conclude that the record before us is insufficient to prove all four elements that are required to establish liability under the state-created danger theory. Plaintiff's Motion for Summary Judgment is, accordingly, denied as to this aspect of his claim for relief pursuant to Section 1983

## IV.  CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is denied. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.