# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD BADWAY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | NO. 07-1333 |

### MEMORANDUM

**Padova, J.**                                                                                                       **March 15, 2010**

Plaintiff, executor of the estate of Richard Badway, Jr. ("Ricky"), has brought this action against the City of Philadelphia (the "City") pursuant to 42 U.S.C. § 1983 and state law. Plaintiff contends that the City violated Ricky's Fourteenth Amendment substantive due process rights to life and liberty, and acted negligently, by failing to timely dispatch an Advanced Life Support ambulance to assist Ricky after his girlfriend called 911 on his behalf. Before the Court is Defendant's Motion for Summary Judgment. For the reasons that follow, the Motion is granted.

### I. FACTUAL BACKGROUND[1]

This case concerns the City's provision of emergency medical services ("EMS") in connection with Ricky's death. Ricky collapsed at approximately 1:00 a.m. on October 22, 2005, shortly after complaining that his heart felt "funny." (Whittaker Dep. at 30, 33.) Ricky's girlfriend, Erin Whittaker, called 911 at 1:00:21 a.m. (Pl. Ex. M.) After 10-15 seconds, Whittaker was connected to Shakeema James, a female 911 operator in Philadelphia. (Whittaker Dep. at 37; Pl. Ex. P at 1.) Whittaker told James that her boyfriend had collapsed and James told Whittaker that "help was on the way . . . they were sending an ambulance right now." (Whittaker Dep. at 38.) A couple

---

[1] We set forth the facts of this case in detail in our August 19, 2009 Memorandum and Order denying Plaintiff's Motion for Summary Judgment. See Badway v. City of Phila., Civ. A. No. 07-1333, 2009 WL 2569260 (E.D. Pa. Aug. 19, 2009). Consequently, this Memorandum addresses only those facts that are necessary to our analysis of the instant Motion.

of minutes later, after Ricky's lips turned blue and Whittaker was unable to locate his pulse, James told her to perform CPR on Ricky and gave her CPR instructions over the phone. (Id. at 39-40.) Whittaker asked James a few times whether an ambulance was coming and James responded "Yes, they're on their way." (Id. at 42.)

Unfortunately, the first responders to arrive on the scene did not reach Whittaker's apartment until 1:09:26 a.m. (Pl. Ex. M.) When the first responders, a police officer and two firefighters who were emergency medical technicians ("EMTs"), reached the scene, Ricky's upper abdominal area, face, neck and upper extremities were blue and he did not have a pulse. (Whittaker Dep. at 43, 45; Davis Dep. at 39-40.) The EMTs hooked Ricky up to an Automated External Defibrillator (AED), inserted an oral pharyngeal to keep his airway open, and performed CPR until a paramedic unit arrived at 1:21:53 a.m. (Davis Dep. at 40-41; Pl. Ex. M.) The paramedics intubated Ricky, put him on a heart monitor, started an IV and administered the first round of epi. (Murphy Dep. at 44.) The paramedics transported Ricky to Roxborough Memorial Hospital (1.1 miles from Whittaker's apartment) at 1:34 a.m. (Pl. Ex. R.) They arrived at the hospital at 1:36 a.m. (Id.) Ricky was pronounced dead at 2:10 a.m. (Pl. Ex. S at 1.) The cause of death was cardiac dysrhythmia. (Id.)

Plaintiff contends that the City of Philadelphia's policies regarding its 911 service and the manner in which EMS are dispatched, placed Ricky "in a position of danger that he would not otherwise have faced, and caused an increase in the likelihood of his death." (Pl. Mem. at 3-4.) According to Plaintiff, the City's policies contributed to Ricky's death because the City encourages residents to call 911 for EMS, despite being aware that its EMS dispatch procedures are inefficient and could result in considerable delay in the arrival of appropriate emergency services.

The City delivers EMS through a tiered system:

1. Basic Life Support ("BLS") units, ambulances that are staffed with two EMTs. (Pl. Ex. C. at 1.) The EMTs can read vital signs, administer oxygen and perform CPR. (Id. at 1.) They cannot perform invasive procedures or administer drugs. (Id.)

2. First Responder Units ("FRUs"), fire engines that are staffed with two firefighters who are trained as EMTs. (Id. at 1-2.) The FRUs cannot transport patients to the hospital. (Id. at 2.)

3. Advanced Life Support ("ALS") units, ambulances that are staffed with two paramedics who are certified to "handle advanced pre-hospital emergency medical care of serious illness or injury." (Id. at 1.) Paramedics on ALS units can read electrocardiograms, perform invasive procedures, "such as intravenous cannulation or endotrachael intubation[,]" and administer medication. (Id.)

The City has 45 ambulances, 28 of which are staffed 24 hours a day, seven days a week. (Id. at 2.) The remaining 17 ambulances are used for peak hours only. (Id.) Thirty-six of the City's ambulances are ALS units, nine are BLS units. (Id. n.2.) Ambulances are assigned to a home firehouse, but can be designated to respond in an area outside of their home boundaries if they are closest to the scene of the emergency. (Id.) FRUs are able to arrive at the scene of an emergency more quickly than ALS and BLS units because there are 90 engine and ladder companies distributed throughout the City. (Id.)

The City encourages its residents to call 911 for medical emergencies. (Pl. Req. for Admis. No. 12.A;[2] Pl. Ex. C at 3; Moore Dep. at 180.) Once a caller reaches a 911 operator, the operator

---

[2] Defendant never filed responses to Plaintiff's Requests for Admission. The matters addressed by those Requests are, accordingly, admitted. Fed. R. Civ. P. 36(a)(3).

first determines whether the caller requires fire or EMS services. (Pl. Ex. C at 3.) If the caller requires EMS services, the 911 operator prioritizes the call into one of three categories: Priority 1 (Code Blue), the person in need of emergency services is not breathing; Priority 2 (A/T), the person in need of emergency services is having difficulty breathing, is in cardiac arrest, is having a stroke, is the victim of a shooting or stabbing, or has fallen more than ten feet and needs ALS or trauma services; and Priority 3, the person requesting emergency services has minor injuries, flu-like symptoms, or is not feeling well. (Id. at 3, 19; Pl. Req. for Admis. No. 12.D.)

Once the 911 operator has classified the emergency call, he or she logs it into a Computer Assisted Dispatch ("CAD") System. (Pl. Ex. C at 3.) Calls are dispatched in the order they are entered into the CAD System, not according to their priority. (Id.) The CAD System recommends which ambulance to dispatch based on the closest available fire station to the location of the emergency. (Id.) However, since the BLS and ALS units are not limited to calls in their home area and they frequently handle runs away from their home area, the CAD System's recommendations are generally useless. (Id. at 19.) Instead, dispatchers rely on radio traffic to identify the location of ambulances and determine which ambulance to dispatch. (Id.)

Plaintiff has asserted claims against the City for violation of his Fourteenth Amendment substantive right to due process pursuant to 42 U.S.C. § 1983 and for negligence pursuant to Pennsylvania common law. In support of these claims, he maintains that the City's policies regarding dispatching EMS, and assuring callers that help is on the way, played a direct role in Ricky's death. A timeline of James's actions in dispatching EMS to Whittaker's apartment shows that no ambulances were immediately available to assist Ricky and that James had to use the radio to call several ambulances before she was finally able to dispatch the paramedics that reached Ricky.

4

Indeed, James did not dispatch any responders to Whittaker's apartment for two and one-half minutes after receiving the 911 call, and did not dispatch the paramedic unit that eventually arrived at Whittaker's apartment for more than eight minutes after she received the 911 call. Despite these delays, James repeatedly assured Whittaker that "help was on the way . . . they were sending an ambulance right now." (Whittaker Dep. at 38, 42.)

When James received Whittaker's 911 call at 1:00:21, the CAD unit could only recommend a FRU because there were no ambulances available in the first 32 fire stations closest to Whittaker's apartment. (Pl Ex. P at 1.) James called up a display of all available medic units and dispatched Engine 12 ("E12", a FRU) and Medic 2 ("M2") at 1:02:55. (Pl. Ex. M; Pl. Ex. P at 1). At 1:04:00, Medic Unit 13 ("M13") became available at Presbyterian Hospital and James decided to dispatch M13 instead of M2, because M13 was closer to Whittaker's apartment. (Pl. Ex. M; Pl. Ex. P at 1.) At 1:05:16, FRU E12 confirmed that it was responding to Whittaker's address and James responded that it was a "code blue." (Pl. Ex. M.) At 1:05:55, ambulance M24, which had previously been off radio and unavailable at Einstein Medical Center, called into the radio and announced that it was available. (Id.) At 1:06:24, James decided to dispatch M24 instead of M13 and recalled M13. (Id., Pl. Ex. P at 1.) At 1:08:03, ambulance M22, which had also been off radio and unavailable at Einstein Medical Center, reported by radio that it was available and asked James if she wanted it to take the code. (Pl. Ex. M; Pl. Ex. P at 1.) At 1:08:14, James checked by radio with M24 and learned that M24 was just then starting to leave Einstein, nearly two full minutes after it had been dispatched. (Pl. Ex. M; Pl. Ex. P at 1-2.) James then dispatched M22 to Whittaker's apartment at 1:08:17 and dispatched M24 to another emergency call. (Pl. Ex. M; Pl. Ex. P at 2.) FRU E12 arrived at Whittaker's apartment at 1:09:26, 6 minutes and 31 seconds after it had been dispatched, and 9

5

minutes and five seconds after James took Whittaker's 911 call. (Pl. Ex. M; Pl. Ex. P at 2.) Ambulance M22 arrived at Whittaker's apartment at 1:21:53, 13 minutes and 36 seconds after being dispatched, but 21 minutes and 32 seconds after James received Whittaker's 911 call. (Pl. Ex. M.)

Plaintiff contends that the City's delay in providing appropriate emergency services to Ricky contributed to his death. Plaintiff relies on the expert report of Sheldon L. Brownstein, M.D., F.A.C.C., a cardiologist, who opined that "the tardiness in response to the decedent contributed to his death by falling outside the standard of care in a metropolitan or urban setting." (Brownstein Rpt. at 2.) According to Dr. Brownstein, if Ricky had received advanced life support (which Dr. Brownstein defined as an airway, breathing and CPR), within five to six minutes of the onset of his cardiac dysrhythmia, he would have had a 30-50% chance of survival. (Id.) The FRU unit did not reach Ricky and begin providing an airway, breathing and CPR until 9 minutes and 5 seconds after Whittaker called 911. (Pl. Ex. M; Davis Dep. at 40-41.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). An issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must -- by affidavits or otherwise as provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). That is, summary judgment is appropriate if the non-moving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III. DISCUSSION

### A. Plaintiff's § 1983 Claim

In order to "establish valid claims under § 1983, a plaintiff must demonstrate that the defendants, while acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States." Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir. 2005) (citing Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)). Plaintiff asserts that the City violated Ricky's substantive due process rights to life and liberty secured by the Fourteenth Amendment. The City argues that it is entitled to summary judgment in its favor with respect to Plaintiff's § 1983 claim because Plaintiff has failed to establish that Ricky's substantive due process rights were violated.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV § 1. The Clause is, however, "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." DeShaney v. Winnebago County Dep't

of Soc. Servs., 489 U.S. 189, 195 (1989). Consequently, the Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." Id. Therefore, the "Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Id. at 196 (citations omitted). It follows, based upon this principle, that "there is no federal constitutional right to rescue services, competent or otherwise" and that the Due Process Clause of the Fourteenth Amendment does not "place an affirmative obligation on the State to provide competent rescue services if it chooses to provide them." Brown v. Commonwealth of Pa. Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 478 (3d Cir. 2003).

We conclude, therefore, that the City's provision of flawed emergency services did not, by itself, violate Ricky's substantive due process rights to life and liberty pursuant to the Fourteenth Amendment. There are, however, two exceptions to the general rule that "the Due Process Clause does not impose an affirmative duty upon the state to protect citizens . . . ." Sanford v. Stiles, 456 F.3d 298, 303-04 (3d Cir. 2006) (citing DeShaney, 489 U.S. at 198-200). "First, the state has a duty to protect or care for individuals when a 'special relationship' exists." Id. at 304 (footnote omitted). "Second, the state has a duty when a 'state-created danger' is involved." Id. (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir. 1997)). Plaintiff maintains that both of these exceptions apply in this case.

1. Special Relationship

Plaintiff contends that Ricky had a special relationship with the City, such that the City had

of Soc. Servs., 489 U.S. 189, 195 (1989). Consequently, the Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." Id. Therefore, the "Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Id. at 196 (citations omitted). It follows, based upon this principle, that "there is no federal constitutional right to rescue services, competent or otherwise" and that the Due Process Clause of the Fourteenth Amendment does not "place an affirmative obligation on the State to provide competent rescue services if it chooses to provide them." Brown v. Commonwealth of Pa. Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 478 (3d Cir. 2003).

We conclude, therefore, that the City's provision of flawed emergency services did not, by itself, violate Ricky's substantive due process rights to life and liberty pursuant to the Fourteenth Amendment. There are, however, two exceptions to the general rule that "the Due Process Clause does not impose an affirmative duty upon the state to protect citizens . . . ." Sanford v. Stiles, 456 F.3d 298, 303-04 (3d Cir. 2006) (citing DeShaney, 489 U.S. at 198-200). "First, the state has a duty to protect or care for individuals when a 'special relationship' exists." Id. at 304 (footnote omitted). "Second, the state has a duty when a 'state-created danger' is involved." Id. (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir. 1997)). Plaintiff maintains that both of these exceptions apply in this case.

1. Special Relationship

Plaintiff contends that Ricky had a special relationship with the City, such that the City had

an affirmative duty to provide him with timely ALS services. According to Plaintiff, this special relationship arose from the City's policy of encouraging residents to call 911 for emergency services. Plaintiff maintains that, once a person calls the City's 911 service, he or she is told that help is on the way and to wait for an ambulance, effectively preventing the caller from contacting a private ambulance service. The evidence of record supports this contention. (Moore Dep. at 180, 209-10; Pl. Req. for Admis. Nos. 12.F, 12.G, 12.O, 12.P; James Dep. at 58.) The record also supports Plaintiff's contention that these City policies were followed in the instant case, as the record demonstrates that James repeatedly told Whittaker that help was on the way, and never advised her to call a private ambulance service. (Id. at 38, 42-43.)

The City argues that it did not have a special relationship with Ricky such that it had an affirmative duty to provide him with timely and adequate emergency care. The Supreme Court explained in DeShaney that the special relationship exception applies only when the State exercises physical custody over the individual without his or her consent:

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs - e.g., food, clothing, shelter, medical care, and reasonable safety - it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf - through incarceration, institutionalization, or other similar restraint of personal liberty - which is the "deprivation of

9

> liberty" triggering the protections of the Due Process Clause, not its
> failure to act to protect his liberty interests against harms inflicted by
> other means.

DeShaney, 489 U.S. at 199-200 (citations and footnotes omitted). Consequently, the City could only create a special relationship with Ricky by taking involuntary, full-time, and continuous physical custody of him:

> The state's duty to prisoners and involuntarily committed patients
> exists because of the full time severe and continuous state restriction
> of liberty in both environments. Institutionalized persons are wholly
> dependant upon the state for food, shelter, clothing and safety. It is
> not within their power to provide for themselves, nor are they given
> the opportunity to seek outside help to meet their basic needs.

D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1371 (3d Cir. 1992). Consequently, an involuntary custodial relationship is not a special relationship unless the state restricts the freedom of the individual to the extent that he is "prevented from meeting [his] basic needs." Id. at 1372 (citation omitted).

Plaintiff has submitted no evidence that Ricky was involuntarily subjected to the physical control of the City, creating such a special relationship. Although Ricky did not call 911 himself and, being unconscious, could not consent to Whittaker's call, the City did not affirmatively act to restrain Ricky's freedom to act on his own behalf. See DeShaney, 489 U.S. at 200; see also Regalbuto v. City of Phila., 937 F. Supp. 374, 379-80 (E.D. Pa. 1995), aff'd 91 F.3d 125 (3d Cir. 1996) (finding no special relationship where Regalbuto "was [allegedly] deprived of his ability to seek alternative sources of aid because the [911] dispatcher repeatedly assured the callers [to the 911 system] that help was on the way"); Huston v. Montgomery County, Civ. A. No. 95-4209, 1995 WL 766308, at *4 (E.D. Pa. Dec. 28, 1995) (noting that the defendant's promotion "of the '911' system

as the primary emergency services system for the citizens of Montgomery County" and the "assurance of the '911' dispatcher(s) to Patrick Huston and his fiancee that an ambulance was on its way and that Patrick Huston should lie down and not move" did not create a special relationship between Huston and Montgomery County). Moreover, even if the City had taken involuntary physical custody of Ricky at the time Whittaker placed her call to 911, 21 minutes of physical custody is not sufficiently full-time and continuous to establish a special relationship between Ricky and the City. See Sanders v. City of Phila., 513 F. Supp. 2d 439, 446 (E.D. Pa. 2007) (holding that a ten minute confinement in the back of a patrol wagon en route to the hospital did not create a special relationship). We conclude, therefore, that there is no evidence on the record before us that would establish that a special relationship existed between Ricky and the City such that the City had an affirmative duty to provide Ricky with timely and adequate emergency care.

2.  State created danger

Plaintiff also contends that the City is liable for Ricky's death because it created or enhanced the danger to Ricky's life. A municipality may be liable under § 1983 claim pursuant to the state-created danger theory, where that municipality has acted to "*create* or *enhance* a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process." Sanford v. Stiles, 456 F.3d at 304 (citing Kneipp v. Tedder, 95 F.3d 1199, 1205 (3d Cir. 1996), and Brown, 318 F.3d at 478). In order to prevail under the state-created danger theory, Plaintiff must prove the following four elements:

> "(1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;

> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all."

Id. at 304-05 (quoting Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006), and citing Estate of Smith v. Marasco, 430 F.3d 140, 153 (3d Cir. 2005)). The City argues that it is entitled to the entry of summary judgment with respect to Plaintiff's § 1983 claim because Plaintiff cannot prove the second and fourth elements of this test. We need only address the fourth element, however, because Plaintiff cannot prevail under this theory if he cannot establish this element.

Plaintiff contends that James, a state actor, affirmatively misled Whittaker, preventing her from obtaining alternative medical services that would have enabled Ricky to survive. There is evidence on the record before us that James told Whittaker that help was on the way even though she was aware that Ricky was turning blue and that she had only been able to timely dispatch a FRU. (Whittaker Dep. at 37-40.) This evidence is not, however, sufficient to establish that a state actor affirmatively used his or her authority in a way that created danger to Ricky or made him more vulnerable to danger than if he or she had not acted. Sanford, 456 F.3d at 305.

The Third Circuit has held that "an assurance . . . is not an affirmative act sufficient to trigger constitutional obligations." Ye v. United States, 484 F.3d 634, 635, 641-42 (3d Cir. 2007) (finding that a publicly employed doctor's assurance that his patient was fine and had nothing to worry about was not an affirmative act that satisfied the fourth element of the state created danger theory even though the patient was having a heart attack and refrained from obtaining further medical help

because of the doctor's assurance). Consequently, James's statements to Whittaker that help was on the way cannot constitute affirmative acts that created a danger to Ricky or that made Ricky more vulnerable to danger. Sanford, 456 F.3d at 305. We conclude, accordingly, that the evidence of record does not establish that a state actor affirmatively created or enhanced the danger that Ricky would die of cardiac dysrhythmia or made him more vulnerable to death from cardiac dysrhythmia.

We hold, therefore, that Plaintiff has failed to satisfy his burden of coming forward with evidence sufficient to establish either the existence of a special relationship between Ricky and the City or that the City created or enhanced a danger that deprived Ricky of his Fourteenth Amendment substantive due process right to life and liberty. We further hold that the City is entitled to judgment as a matter of law with respect to Plaintiff's § 1983 claim. The City's Motion for Summary Judgment is, accordingly, granted as to Plaintiff's § 1983 claim.

B. Plaintiff's Negligence Claim

In addition to the cause of action brought pursuant to § 1983, the Complaint also alleges a negligence claim against the City of Philadelphia pursuant to Pennsylvania's wrongful death and survival statutes, 42 Pa. Cons. Stat. Ann. §§ 8301-8302. The City has moved for summary judgment in its favor as to this claim pursuant to the Political Subdivisions Tort Claims Act, 42 Pa. Cons. Stat. Ann. § 8541, *et seq.* (the "Tort Claims Act"). The Tort Claims Act provides broad immunity to local agencies, such as the City, providing that "'no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.'" Sanford, 456 F.3d at 315 (quoting 42 Pa. Cons. Stat. Ann. § 8541). There are eight exceptions to this broad immunity, permitting the imposition of liability for negligence relating to:

> (1) the operation of a motor vehicle in the possession or control of a local agency; (2) the care, custody or control of personal property in the possession or control of a local agency; (3) the care, custody or control of real property; (4) a dangerous condition created by trees, traffic controls, or street lights; (5) a dangerous condition of utility service facilities; (6) a dangerous condition of streets; (7) a dangerous condition of sidewalks; (8) the care, custody or control of animals in the possession or control of a local agency.

Id. at 315 and n.18 (citing 42 Pa. Cons. Stat. Ann. § 8542). None of these exceptions apply in this case. We hold, accordingly, that the City is entitled to the entry of judgment as a matter of law as to Plaintiff's negligence claim.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.